IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| YOLANDA R. DAVIS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 19 C 6036 |
| v. ) | |
| ) | Judge John Z. Lee |
| ADVOCATE HEALTH CARE d/b/a ) | |
| ILLINOIS MASONIC HOSPITAL, ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

While working for Defendant Advocate Health Care d/b/a Illinois Masonic Hospital ("Advocate"), Plaintiff Yolanda Davis developed a friendly relationship with a co-worker with the same position. But the relationship soured after Davis rejected the co-worker's romantic advances, prompting the co-worker to begin harassing Davis at work. In turn, Davis threatened to slap the co-worker. Their supervisor took steps to separate them, but after another incident occured a few months later, involving another possible threat of violence from Davis, she was placed on investigatory leave, which she ultimately converted to medical leave before resigning. In this action, Davis brings discrimination claims against Advocate under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*. Before the Court is Advocate's motion for summary judgment. For the reasons set forth below, the motion is granted.

I. **Background**[1]

Advocate, the largest healthcare system in Illinois, is a non-profit organization consisting of hospitals, outpatient centers, and immediate care clinics. Def.'s LR 56.1(a)(3) Statement of Facts ("DSOF") ¶ 5, ECF No. 46. One of the facilities that Advocate operates is Advocate Illinois Masonic Medical Center ("Masonic"). *Id.*

Davis began working for Advocate as a Patient Care Technician at Masonic in January 2018. *Id.* ¶ 6. Her direct supervisor was Cathy Rodriguez, a Clinical Nurse manager. *Id.* ¶ 7. In terms of Human Resource ("HR"), there was an onsite employee named Aaron Witkowski to handle urgent matters, as well as a central HR group where Robert Favaro (among others) handled issues arising through Advocate's HR hotline, called "HR Direct," including harassment complaints. *Id.* ¶¶ 8–10. Advocate's Sexual Harassment Policy strictly prohibits harassment and any form of retaliation for reporting harassment and requires employees to report any such incident to HR or a few other management personnel. *Id.* ¶ 12.

A few times per month, Davis worked the same shift as another Patient Care Technician named Sharon Jackson. *Id.* ¶¶ 14–15; *see* Pl.'s Resp. DSOF ("RSOF") ¶ 15, ECF No. 47. The two developed a friendly and, for a time, mutually agreeable relationship, with Davis calling Jackson "Boo" on one occasion. DSOF ¶ 16. They saw each other outside of work five times as well, including outings to breakfast, a movie, a play, and a spa. *Id.* ¶ 17. They also spoke on the phone numerous times, for up to an hour at a time, and texted each other several times per week. *Id.* ¶ 18.

---

[1] The following facts are undisputed or deemed admitted, including due to a party's noncompliance with Local Rule 56.1(b)(3)(B), unless otherwise noted.

In late October or early November of 2018, Jackson expressed an romantic interest in Davis, saying that she was lonely, that she would take care of Davis, and that they could get married, even if Davis did not want to sleep together. *Id.* ¶¶ 19–20. Jackson also told Davis that she "liked black girls with ass and titties." *Id.* ¶ 21. Davis responded that she was not interested in women and did not want to marry Jackson. This caused a falling-out between them. *Id.* ¶¶ 22–24. Jackson did not make any further advances toward Davis following this conversation. *Id.* ¶ 25.

Instead, Davis asserts, Jackson began to harass her at work by directing inappropriate comments toward her several times per week, including calling her derogatory names and making fun of her appearance. *Id.* ¶ 27. At the same time, Jackson became concerned that Davis, who Jackson says had once conveyed a desire to harm a nurse, wanted to hurt her or another coworker. *Id.* ¶ 28. Jackson expressed these concerns to Rodriguez in an email on November 27, 2018, stating that she had received numerous text messages from Davis threatening to harm her at work. *Id.* ¶ 30; *see id.*, Ex. 4, Rodriguez Decl. ¶ 4, ECF No. 46-5. Understanding Jackson to be reporting a potential for workplace violence, Rodriguez contacted Witkowski in HR, and the three of them met to discuss Jackson's complaint the following day. DSOF ¶¶ 9, 31–32.

Rodriguez then met with Davis three days later, on November 30, 2018, with Witkowski participating by phone. *Id.* ¶ 35. During this meeting, Davis admitted to having threatened to slap Jackson in the face. *Id.* ¶ 36. Later that day, Witkowski issued a memorandum to Davis confirming Advocate's zero-tolerance policy for

3

harassing or intimidating behavior in the workplace and ordering Davis to refrain from having any personal communication with Jackson, by any means, outside of work. *Id.* ¶ 38. The memorandum also referred Davis to Advocate's Employee Assistance Program ("EAP") based on her threat of violence against Jackson, requiring her to meet with a counselor for one hour before returning to work. *Id.* ¶¶ 39–40.

Immediately after meeting with Rodriguez and Witkowski, Davis called HR Direct to lodge a complaint of her own against Jackson. *Id.* ¶ 43. Favaro was assigned to the complaint, and he asked Davis whether she had any evidence of her allegations. Davis responded that she had text messages, but never showed them to him. *Id.* ¶¶ 45, 48. Favaro also conferred with onsite HR personnel, whose own investigation into Davis's allegations found that they could not be substantiated. *Id.* ¶ 46; *see* Pl.'s LR 56.1(b)(3)(C) Statement of Additional Facts ("PSOAF") ¶ 11, ECF No. 48.

Davis returned to work on December 4, 2018, after completing her EAP referral (she was paid for the days she was taken off the schedule). DSOF ¶¶ 42, 47. Rodriguez approached her that day to tell her that HR wanted to speak with her about her complaint, but Davis refused to leave her cubicle, citing her mistrust of Rodriguez and HR. *Id.* ¶ 47; *see* PSOAF, Ex. 1, Davis Dep. ("Davis Dep.") at 113:12–114:5, ECF No. 46-3. Ultimately, Rodriguez assigned Davis and Jackson to patient rooms at opposite ends of the unit, instructing each of them not to interact or even cross paths with the other, unless there was a patient emergency that required the two of them to cooperate. DSOF ¶¶ 50–51. Rodriguez also reached out to the charge

nurses on the unit so that he could confirm that they had not witnessed any ongoing issues between Davis and Jackson. *Id.* ¶ 53.

On December 7, 2018, Davis emailed Favaro with complaints against Jackson similar to those she had previously reported to HR Direct. *Id.* ¶ 55. Favaro responded that onsite HR had already investigated most, if not all, of her allegations and could not substantiate them, but said that he would look into them further anyway. Favaro did not find anything new. *See id.* ¶¶ 55–56; *id.*, Ex. C, Favaro Decl., Ex. D, 1/2/19 Letter from R. Favaro to Y. Davis, ECF No. 46-34 at 18–19; PSOAF ¶ 11.

A few weeks later, Davis complained to Favaro that Rodriguez had told her to find another job. But Rodriguez clarified to Favaro that she only had told Davis that she "may need to find another job" if she felt the situation was not working for her. DSOF ¶ 49; PSOAF ¶ 13.

Around the same time, Rodriguez offered Davis the option of transferring to another shift (one that Jackson did not work), but Davis turned it down because the shift was part-time. DSOF ¶ 60. Instead, Davis applied to four other available full-time positions with Advocate, including three at Masonic. However, she did not receive any of them—one, because she was not qualified for the position; another, because Advocate was already considering a candidate who had applied a month before; and the remaining two, because the positions were cancelled and never filled. *Id.* ¶ 62. The resume that Davis used to apply to these positions was both outdated and incomplete and did not indicate that she already worked at Masonic. *Id.* ¶ 65.

A few months later, on February 14, 2019, Rodriguez received complaints from both Davis and Jackson by email. *Id.* ¶¶ 68–69. Davis complained that, during the previous night shift, she had overheard Jackson call her a "bitch," make fun of her appearance, and accuse her of sleeping with a male co-worker to a nurse named Chester. *Id.* ¶ 68; PSOAF ¶ 15. In turn, Jackson complained that, earlier in the morning of the fourteenth, Davis had passed by her patient room and shouted at her, "I heard [y'all] asses last night. Well, I got you all back." DSOF ¶ 69. Jackson added that Davis approached her in the breakroom about twenty minutes later on and said, "[W]hat are you going to do now? Chester and them aren't here." *Id.* Rodriguez found Jackson's complaint to be particularly concerning, because she understood it to be another threat of violence by Davis. *Id.* ¶ 70.

After receiving the emails, Rodriguez placed Davis on paid "investigatory" leave that same day so that Rodriguez could investigate the allegations before Davis and Jackson worked the same shift again, informing Davis that the leave was not a disciplinary measure. *Id.* ¶ 71. Rodriguez then interviewed both women as well as other witnesses to the incidents at issue, including a nurse who said that she had seen Davis walk over to Jackson's patient room on February 14. *Id.* ¶ 72. Based on this investigation, Rodriguez drafted a corrective action for Davis and submitted it to Favaro for his review. *Id.* ¶¶ 74–75. The corrective action was never approved or issued, however, because, at the request of her doctor, Davis eventually converted her investigatory leave into a medical leave. She remained on leave until she resigned her employment on April 15, 2019. *Id.* ¶¶ 75–76; *see* Davis Dep. 158:18–163:20.

6

## II.     Legal Standard

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The evidence considered for summary judgment "must be admissible if offered at trial, except that affidavits, depositions, and other written forms of testimony can substitute for live testimony." *Malin v. Hospira, Inc.*, 762 F.3d 552, 554–55 (7th Cir. 2014). In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 794 (7th Cir. 2013).

The moving party has the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The nonmoving party must then "come forward with specific facts showing that there is a genuine issue for trial." *LaRiviere v. Bd. of Trs. of S. Ill. Univ.*, 926 F.3d 356, 359 (7th Cir. 2019). To satisfy that ultimate burden, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor," *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

### III. <u>Analysis</u>

Davis raises a claim of hostile work environment based on sexual harassment as well as a claim of retaliation, both under Title VII. *See* Am. Compl. ¶¶ 32–38, 49–59, ECF No. 16. Advocate has filed a motion for summary judgment. *See* Def.'s Mot. Summ. J., ECF No. 44. The Court will address each claim in turn.[2]

### A. **Hostile Work Environment**

An employer may be liable for discrimination under Title VII where an employee is subject to a hostile work environment based on her membership in a protected class. *See Mason v. S. Illinois Univ. at Carbondale*, 233 F.3d 1036, 1043 (7th Cir. 2000). To survive summary judgment on this claim, Davis must point to evidence demonstrating that "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 920 (7th Cir. 2016).

As an initial matter, Advocate insists that Davis cannot establish that she endured "objectively . . . severe or pervasive" harassment. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) (cleaned up). Courts consider several factors in determining whether harassment is objectively severe or pervasive, including its frequency and severity; "whether it is physically threatening or

---

[2] Advocate also has moved for summary judgment as to the other two claims alleged in Davis's operative complaint: sex discrimination under Title VII, and intentional infliction of emotional distress under Illinois law. *See* Am. Compl. ¶¶ 39–48, 60–64. Davis, however, fails to address either claim in her response brief. As a result, she has waived any arguments as to those claims, and they are dismissed. *See Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999).

8

humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Boss*, 816 F.3d at 920. "Offhand comments, isolated incidents, and simple teasing do not rise to th[is] level." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840–41 (7th Cir. 2009).

Advocate has the better argument here. Indeed, as Davis concedes, her evidence of harassment is limited to "several" offensive comments that Jackson directed to her a few times per week during the month of November 2018, plus a few other derogatory comments that she overheard Jackson make one night in February 2019. *See* Pl.'s Resp. Opp'n Mot. Summ. J. ("Pl.'s Resp.") at 6, ECF No. 49. These rather "occasional inappropriate comments," without more, "do not rise to the level of an objectively hostile work environment under Title VII." *See Scruggs*, 587 F.3d at 841 (affirming summary judgment for defendant where plaintiff's supervisor commented that she "was 'made for the back seat of a car' and looked like a 'dyke'"). Moreover, while Davis asserts that Jackson made "threatening" comments toward her as well, she fails to identify any that a reasonable jury could interpret that way. *See* Pl.'s Resp. at 7. And Davis does not show that Jackson's comments humiliated her or interfered much at all with her job performance. Thus, viewing the "totality of the circumstances," the Court finds as a matter of law that Davis did not endure objectively severe or pervasive harassment. *See Boss*, 816 F.3d at 920.

The Court also agrees with Advocate's next argument that, even if Davis could show objectively severe or pervasive harassment, she cannot establish a basis for employer liability. Because Davis attributes the alleged hostile work environment to

9

her co-worker as opposed to her supervisor, Advocate would be liable under a hostile environment claim only if Davis could prove that Advocate was "negligent either in discovering or remedying the harassment." *See Mason*, 233 F.3d at 1043 (cleaned up). In other words, "[t]he employer's legal duty is . . . discharged if it takes reasonable steps to discover and rectify" the co-worker's "acts of sexual harassment." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 432 (7th Cir. 1995). "[W]hat is reasonable depends on the gravity of the harassment." *Id.* In any case, "Title VII does not require that the employer's responses to a plaintiff's complaints successfully prevent subsequent harassment." *Cerros v. Steel Techs., Inc.*, 398 F.3d 944, 954 (7th Cir. 2005) (cleaned up). Rather, the employer's response need only be "reasonably calculated to prevent further harassment under the particular facts of the case at the time the allegations are made." *Id.* at 953 (cleaned up).

Here, on this record, no reasonable jury could find that Advocate was negligent in discovering or remedying Jackson's relatively mild harassment of Davis. First, iot is undisputed that Advocate (*i.e.*, Rodriguez, Witkowski, and Favaro) did not become aware of Jackson's harassment until Davis lodged a formal complaint on November 30, 2018. And, to the extent that Davis contends that Advocate's actions after November 30 were insufficient, the undisputed record indicates that individuals from both onsite and central HR promptly investigated Davis's complaint, which they could not substantiate. What is more, Rodriguez tried to bring Davis to discuss her complaint with HR as soon as she returned to work after completing her EAP referral on December 4, but David refused to go. Moreover, Rodriguez took reasonable

10

measures to prevent any future harassment (by either Jackson or Davis), including moving them to opposite ends of the unit and instructing them not to interact with each other absent a patient emergency. Davis asserts that these efforts did not stop Jackson from occasionally visiting her end of the unit, but she does not contend that Jackson harassed or even interacted with her during these visits. *See* PSOAF ¶ 14; Stovall Dep. at 126:1–19. And, as soon as Rodriguez learned that another incident had occurred between them on February 14, 2019, in which Davis allegedly went to Jackson's end and threatened physical confrontation, Rodriguez took the reasonable step of placing Davis on paid leave while investigating what had happened.[3]

Accordingly, Advocate's motion for summary judgment is granted as to Davis's hostile work environment claim.

**B.     Retaliation**

Davis also claims retaliation in violation of Title VII. To survive summary judgment on this claim, Davis must point to evidence that (1) she engaged in statutorily protected activity, (2) she suffered an adverse employment action, and (3) there is a causal link between the two. *See Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016). Advocate concedes that Davis engaged in protected activity by complaining about Jackson's harassment. But Advocate contends that a

---

[3] The Court notes that Davis largely seems to take issue with what she perceives as Advocate's failure to discipline Jackson adequately for her sexual harassment. But the reasonableness of Advocate's response turns on whether it adequately prevented future harassment, not whether it doled out enough discipline for past harassment. In any event, Davis fails to cast doubt upon Advocate's apparent belief that Jackson's misconduct, which did not involve threats of violence, warranted less intervention than her own.

11

reasonable jury could not find for Davis on the other two elements—adverse employment action and causation.

Davis argues that she suffered an adverse employment action in the form of a constructive discharge. "[C]onstructive discharge occurs when an employer makes an employee's working conditions so intolerable that an employee is forced into involuntary resignation." *Roby v. CWI, Inc.*, 579 F.3d 779, 785 (7th Cir. 2009). Such conditions "require a plaintiff to show a more egregious situation than a hostile work environment[.]" *Id.* "Whether the plaintiff's work environment meets that standard is determined from the viewpoint of a reasonable employee." *Saxton v. Am. Tel. & Tel. Co.*, 10 F.3d 526, 537 (7th Cir. 1993).

Here, Davis bases her claim of constructive discharge on an array of conditions, namely: (1) Jackson's harassment; (2) Advocate's allegedly inadequate investigation of her complaints against Jackson; (3) Davis's EAP referral; (4) Rodriguez's comment that Davis may need to find another job; (5) Advocate's denial of her applications to other full-time positions; and (6) her investigatory leave. However, even when these conditions are combined, a reasonable jury could not find that they were so intolerable as to force a reasonable employee to resign.

As discussed above, Jackson's harassment falls well short of creating a hostile work environment, especially given Advocate's reasonable efforts to prevent it from recurring. The EAP referral entailed a brief conversation with a counselor and did not constitute a step in Advocate's progressive discipline policy. DSOF ¶ 41. Rodriguez's comment to Davis that Davis may need to find a new job was isolated,

and Rodriguez clarified to Favaro that she only meant that Davis had to cooperate with Jackson in the event of a patient emergency as part of her job. As for Davis's fruitless applications, these merely maintained the status quo. And, while Davis characterizes her investigatory leave as a kind of suspension, it is undisputed that Rodriguez told her the leave was not disciplinary, but rather meant to facilitate an investigation; that Davis was not formally disciplined; that she received pay while on leave; and that she took medical leave before Advocate could bring her back to work. Thus, "rather than demonstrate constructive discharge," the undisputed record reveals that Davis "essentially just quit coming to work" while Advocate "was attempting to resolve" her issues with Jackson. *See Roby*, 579 F.3d at 786.

Furthermore, even assuming that Davis could prove she was constructively discharged, she cannot show a causal connection between that adverse employment action and her protected activity. For starters, the bulk of Jackson's harassment occurred before Davis ever complained about it, and, again, Advocate took reasonable steps to stamp it out after Davis had complained. In addition, the resume that Davis used to apply to the full-time positions outside of her unit did not reflect her position for Advocate, let alone her issues with Jackson, and Advocate had other reasons not to select her for the positions. Next, even granting the inference that Witkowski and Rodriguez became aware of Davis's initial complaint against Jackson before issuing the EAP referral, the referral was a routine response to Davis's admission that she had threatened to harm Jackson. *Cf. Boss*, 816 F.3d at 918 (indicating that indirect evidence of causation requires the employee to establish that she "was meeting [her]

13

employer's legitimate expectations"). Similarly, Rodriguez's comment that Davis may need to find another job was premised on her inability to cooperate with Jackson, not her historical complaints about Jackson.

As for Davis's paid investigatory leave, it is true, as she emphasizes, that this followed on the heels of her February 14, 2019, complaint. "A causal link," however, "requires more than the mere fact that an employer's action happens after an employee's protective activity." *Id.*; *see also Wyninger*, 361 F.3d at 981 (stating that "mere temporal proximity is not enough to establish a genuine issue of material fact" regarding causation). That is especially so given that Davis's investigatory leave also followed on the heels of Jackson's second complaint against her—which Rodriguez considered to be the more serious of the two insofar as she understood Jackson's to involve another threat of workplace violence. As a result, any inference of retaliation arising from the timing of Davis's investigatory leave yields readily to the "legitimate, nonretaliatory reasons" that Advocate has articulated for this action. *Cf. Boss*, 816 F.3d at 918 (stating that such reasons rebut a prima facie case of retaliatory animus).

Davis mounts little retort to these conclusions. In fact, her entire briefing on the element of causation consists of a single sentence asserting, without citation to authority or the record, that her constructive discharge is "inextricably linked" to her complaints against Jackson. Pl.'s Resp. at 10. Not only is the argument unpersuasive for the reasons discussed, but such a "perfunctory and undeveloped" argument amounts to a waiver of this element. *See Crespo v. Colvin*, 824 F.3d 667, 674 (7th Cir. 2016) (cleaned up).

Accordingly, Advocate's motion for summary judgment is granted as to Davis's retaliation claim as well.

## IV. Conclusion

For the reasons set forth above, Advocate's motion for summary judgment is granted. Judgment will be entered in favor of Defendant Advocate Health Care. Civil case terminated.

**IT IS SO ORDERED.**  ENTERED: 9/30/21

_____
**John Z. Lee**
**United States District Judge**